FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUL 22 2008

CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| TERRENCE LEE LIDDELL,<br><br>    Petitioner,<br><br>v.<br><br>MINA MONCADA,<br><br>    Respondent. | No. CV 07-145-TJH (AGR)<br><br>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |

    Pursuant 28 U.S.C. § 636, the Court has reviewed the entire file de novo, including the Complaint, the Magistrate Judge's Report and Recommendation, the Objections to the Report and Recommendation, and all records in the file. Having made a de novo determination, the Court agrees with the recommendation of the Magistrate Judge.

    IT IS ORDERED that Judgment be entered granting defendant's motion for summary judgment and dismissing this action.

DATED: 7/21/08

TERRY J. HATTER JR.
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TERRENCE LEE LIDDELL, | ) | NO. CV 07-145-TJH (AGR) |
| Plaintiff, | ) | |
| v. | ) | REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| MINA MONCADA, | ) | |
| Defendant. | ) | |

The Court submits this Report and Recommendation to the Honorable Terry J. Hatter Jr., United States District Judge, pursuant to 28 U.S.C. § 636 and General Order No. 05-07 of the United States District Court for the Central District of California. For the reasons set forth below, the Magistrate Judge recommends that Defendant's motion for summary judgment be granted.

///
///
///
///
///
///

I.

## SUMMARY OF PROCEEDINGS

On January 9, 2007, Plaintiff filed a complaint pursuant to 42 U.S.C. § 1983 against defendant Moncada in her individual capacity. (Complaint at 1, 3.)

On April 13, 2007, Defendant filed a motion to dismiss the complaint, to consolidate this case with a pending class action, *Hydrick v. Wilson*, 98-7167 TJH, or, in the alternative, to stay this case pending the outcome in *Hydrick*. On April 26, 2007, Plaintiff filed an opposition brief and, *inter alia*, opposed consolidation and a stay. On June 25, 2007, the Court issued an order denying the motion to dismiss, the motion for consolidation, and the motion for a stay.[1] (Docket No. 21.)

On March 10, 2008, Defendant filed a motion for summary judgment and a statement of uncontroverted facts. On March 11, 2008, the Court issued a Notice to Plaintiff of the Requirements of Federal Rule 56 and Local Rule 56 in compliance with *Rand v. Rowland*, 154 F.3d 952, 959-62 (9th Cir. 1998) (en banc).

On April 10, 2008, Plaintiff filed a document entitled "Plaintiff's Objections to Defendant's Motion for Summary Judgment" ("Opposition"). Plaintiff did not file a separate Statement of Genuine Issues. On May 2, 2008, Defendant filed a reply. In addition to these pleadings, the Court reviewed Plaintiff's Complaint and Reply to Defendant's Answer, as well as all attached declarations and evidence.

This matter was taken under submission without oral argument and is now ready for decision.

///

///

---

[1] The Court granted Defendant's request that the prayer for injunctive relief in paragraph 4 of the complaint be stricken. Plaintiff had not objected to Defendant's motion to strike.

2

## II.

## **FACTUAL BACKGROUND**

On February 10, 2006, Plaintiff was walking in the courtyard of Atascadero State Hospital ("ASH"), where he is confined as a sexually violent predator ("SVP"), when Plaintiff was attacked without provocation by Jeremy Whitlock, a patient "with a long history of violent attacks on other patients." (Complaint at 5; Plaintiff's Reply to Defendant's Answer ¶ 11; *see* Albertson Decl., attached as Exh. A to Complaint.)

Earlier, at about 8:00 p.m. on February 10, 2006, Defendant Mina Moncada, a psychiatric technician, escorted Whitlock to the courtyard on "line of sight". (Moncada Decl. ¶¶ 1, 15.) "When a patient is on a 'line of sight,' he must remain where an assigned staff member can observe him at all times without barriers between himself and the staff member." (*Id.* ¶ 7.) According to Plaintiff, a staff supervisor must remain no more than five or six feet from the patient being supervised or, in the alternative, keep the patient in line of sight without obstruction. (Complaint at 5.1 & nn.1-2; Plaintiff's Reply to Defendant's Answer ¶ 24.)

Moncada states that, during the walk in the main courtyard, "Whitlock began to walk very briskly, making it hard for me to stay with him at that pace. I directed Mr. Whitlock to stay with me as his escort but he would not comply. In order for me to stay with Mr. Whitlock I had to run. He managed to get to the other side of the courtyard and then I saw him exit the main courtyard. I followed him back to the treatment unit." (Moncada Decl. ¶ 17.) Moncada "momentarily lost site (sic) of Mr. Whitlock as he moved through a group of patients." (*Id.* ¶ 24.) Moncada did not see Whitlock actually strike anyone in the main courtyard, but she did see a patient on the ground just before Whitlock exited the courtyard. (*Id.* ¶ 18.)

///

1   After the incident, Plaintiff was told by another patient that initially Whitlock
2   had leather restraints. However, Moncada removed Whitlock's restraints so
3   Whitlock could smoke a cigarette. Moncada then somehow "lost" Whitlock.
4   (Complaint at 5.1; Reply to Defendant's Answer ¶ 27.) Although Plaintiff referred
5   to a declaration of Michael St. Martin, no such declaration was attached. Plaintiff
6   does not state that he saw Whitlock prior to the attack.

7   According to Whitlock's charts for February 10, 2006, Whitlock was
8   smoking during an earlier walk at 1:20 p.m., not at 8:00 p.m. (Exh. B at 1 to
9   Moncada Decl.)  At 1:20 p.m., Whitlock "had a walk in the main courtyard and
10  smoked and socialized with peers in the courtyard. He seemed to enjoy himself
11  watching the softball game." (*Id.*) During the 1:20 p.m. walk, Whitlock was not
12  escorted by Moncada but by someone else. Moreover, there is no indication that
13  Whitlock was in restraints during either walk. (*Id.*)

14  After attacking Plaintiff during the 8:00 p.m. walk, Whitlock fled the scene,
15  exited the main courtyard and returned to Unit 5.[2] (Complaint at 5.1.) Whitlock
16  was then placed in restraints. (Moncada Decl. ¶ 19.)

17  As a result of Whitlock's attack, Plaintiff momentarily lost consciousness,
18  fell to the asphalt track, and bled from his nose, mouth, knees, and hands.
19  (Complaint at 5-5.1.) Medical records state "no loss of consciousness indicated
20  by patient." (Exh. B at 2 to Complaint.) However, Plaintiff told a hospital police
21  officer that he was "dazed and drop[ped] straight down to his knees." (Nunez
22  Decl. ¶ 3 & Exh. A at 55 attached thereto.)

23  Plaintiff was treated for his injuries. (Dr. Shelton Decl. ¶¶ 3-7 & Exhs.
24  attached thereto.) Plaintiff's medical records show that Plaintiff's injuries included
25  a swollen eyelid; a bruise on his right eye; and superficial abrasions on his lower
26  lip, nose area, hand, fingers, and both knees. (Exh. B at 1 to Complaint; Exh. C

---

[2] Whitlock is housed in Unit 5. (Moncada Decl. ¶ 2.)

at 1 to Complaint; Dr. Shelton Decl. ¶ 3.) Plaintiff had some bleeding from his nose. (*Id.*) Plaintiff "claimed he was fine. Just a little pain that's all." (Exh. B at 1 to Complaint.) His pain level was 2 out of 10. (*Id.*)

Whitlock had no known prior association or interaction with Plaintiff. (Maguire Decl. ¶ 13.) When a patient has a known enemy or difficulty with another patient, documentation is placed in the patient's medical record. (*Id.* ¶ 12.) There is no documentation of any prior problem between Whitlock and Plaintiff. (*Id.* ¶ 13; *see* Moncada Decl. ¶ 21.) Plaintiff does not allege that he had prior problems with Whitlock.

Whitlock explained later that he punched Plaintiff once because Plaintiff scared him when Plaintiff came around the track toward him. (Nunez Decl. ¶ 5 & Exh. A at 55, 58 attached thereto; Moncada Decl. ¶¶ 20, 22.)

## III.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023-24 (9th Cir. 2004). A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.

5

Ct. 2548, 91 L. Ed. 2d 265 (1986)). The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where, as here, the nonmoving party is pro se, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820 (2005). The Court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001).

In deciding whether to grant summary judgment, a court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996) (citation omitted). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). A court construes a *pro se* plaintiff's pleadings liberally. *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).

## IV.
## DISCUSSION

"To state a claim for relief under section 1983, [a plaintiff] must plead two essential elements: 1) that the Defendants acted under color of state law; and 2) that the Defendants caused [the plaintiff] to be deprived of a right secured by the

6

Constitution and laws of the United States." *Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir.) (citation omitted), *cert. denied*, 522 U.S. 996 (1997).

### A. **Failure to Protect Standard**

Claims based on conditions of civil commitment raised by SVPs are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment. *Hydrick v. Hunter*, 500 F.3d 978, 994 (9th Cir. 2007).

"The standard applicable to SVPs under the Fourteenth Amendment is at least coextensive with that applicable to prisoners under the Eighth Amendment." *Id.* However, the Eighth Amendment may provide too little protection for those civilly committed, whom the state cannot punish. *Id.* On the other hand, "it cannot be ignored that, unlike the plaintiff in *Youngberg* who was civilly committed because of mental infirmities, SVPs have been civilly committed subsequent to criminal convictions[3] and have been adjudged to pose a danger to the health and safety of others. Therefore, the rights of SVPs may not necessarily be coextensive with those of all other civilly detained persons." *Id.* at 990 (footnote omitted).

"The Eighth Amendment still provides a floor for the level of protection that SVPs must receive under the Fourteenth Amendment, and because the contours of the Eighth Amendment are more defined, Eighth Amendment jurisprudence may provide helpful guidance as to the standards to be applied." *Id.* at 998.

The right to personal security constitutes an "historic liberty interest" protected substantively by the Due Process Clause. *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). That right is not extinguished by lawful confinement. *Id.* at 315 (citation omitted); *see also*

---

[3] Plaintiff was committed to ASH after being incarcerated at Pelican Bay State Prison for 10 years and at Folsom State Prison for six years. (Shelton Decl., Exh. E at 89.) He was originally convicted of rape, burglary, and oral copulation. (*Id.*)

7

*Hydrick*, 500 F.3d at 997 ("The right is clearly established for civilly committed persons") (citation omitted).

"[O]fficials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citation and internal quotations omitted). As the Supreme Court has made clear, "[i]t is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Instead, a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious. "For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* The Supreme Court in *Farmer* left open the question of when the risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.[4] *Id.* at 834 n.3.

Second, "a prison official must have a 'sufficiently culpable state of mind,'" "one of "deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834 (citations omitted). "[A] prison official may be held liable under the Eighth Amendment . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. "[D]eliberate indifference describes a state of mind more blameworthy than negligence" but does not require a "purpose of causing harm or with knowledge that harm will result." *Id.* at 835. Liability requires a showing that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that

---

[4] The Supreme Court has stated that an "isolated mishap" or "'an accident, with no suggestion of malevolence'" would not give rise to an Eighth Amendment violation. *See Baze v. Rees*, 128 S. Ct. 1520, 1531, 170 L. Ed. 2d 420 (2008).

8

a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.

The requisite knowledge may be inferred from circumstantial evidence, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* On the other hand, officials may show, for example, that "they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*

*Farmer*'s protections apply to SVPs. *Hydrick*, 500 F.3d at 996-97. However, Plaintiff argues that the "deliberate indifference" standard does not apply to civil detainees based on *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1120-21 (9th Cir. 2003). This Court need not resolve this issue because it is unnecessary to the resolution of Defendant's motion for summary judgment.

**B.   Analysis**

Plaintiff has failed to create a genuine issue of fact as to a deprivation of a right secured by the Constitution and laws of the United States, the second element of a § 1983 claim. *Johnson*, 113 F.3d at 1117. Plaintiff has not created a genuine issue as to whether he was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citation omitted). Even assuming Plaintiff could surmount that hurdle, Moncada is entitled to qualified immunity because it would not be clear to a reasonable staff employee that the risk of harm was so high that she should not have permitted Whitlock to

///

walk in the main courtyard without restraints. *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1051 (9th Cir. 2002).

### 1.  Substantial Risk of Serious Harm

Plaintiff argues that Moncada's conduct placed him and other patients "at possible risk of assault and injury from Mr. Whitlock." (Opposition at 3.) A "possible risk" is not legally sufficient. For a failure to protect claim, Plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

Moncada, the sole defendant, is a psychiatric technician who escorted Whitlock to the main courtyard on "line of sight" on February 10, 2006, at approximately 8:00 p.m. (Moncada Decl. ¶¶ 1, 15.) Moncada's duties as a psychiatric technician include escorting and observing psychiatric patients on one-to-one and "line of sight" observations. (Moncada Decl. ¶ 1.)

According to the declaration of Michael Maguire, Unit Supervisor of Unit 5 at ASH where Whitlock was housed, Whitlock was a patient "on a special psychiatric behavioral treatment plan to address his aggressive behaviors toward others caused by a severe mental illness." (Maguire Decl. ¶ 2.) That psychiatric behavioral treatment plan contained conditions for placing Whitlock on different levels of observation according to his behavior: placement in restraints, one-to-one observation, and "line of sight" observation. (*Id.* ¶¶ 2-8.) On February 10, 2006, Whitlock was on "line of sight" observation because of his "positive behaviors" and was allowed to be escorted to the main courtyard. (*Id.* ¶¶ 9-10.) According to Maguire, on February 10, 2006, and "for at least two days prior," Whitlock had exhibited cooperative behavior and did not exhibit "precursor behaviors" prior to acting out in an aggressive manner. (*Id.* ¶¶ 2, 9, 11.) For this reason, Whitlock was escorted to the main courtyard on "line of sight" observation on several occasions during the period February 8-10, 2006. (*Id.* ¶ 11.) The notes on Whitlock's walk at 1:20 p.m. on February 10, 2006 (escorted by

10

someone other than Moncada), indicate that he "had a walk in the main courtyard and smoked and socialized with peers in the courtyard. He seemed to enjoy himself watching the softball game." (Exh. B at 1 to Moncada Decl.)

Because there is no evidence that Moncada designed Whitlock's treatment plan, she is responsible only for her conduct in escorting Whitlock to the main courtyard on February 10, 2006. See *Ford*, 301 F.3d at 1051.

Moncada's notes indicate that, at 6:00 p.m. on February 10, 2006, Whitlock "paced in dayroom had internal stimuli was laughing to himself – went to courtyard and did some socializing with peers." (Exh. B at 1 to Moncada Decl.) Later, Whitlock asked Moncada if she would take him to the main courtyard for a walk. Moncada did so at approximately 8:00 p.m. after asking other staff. (*Id.*) Whitlock was on "line of sight" observation. (Moncada Decl. ¶ 15.) "Whitlock began to walk very briskly, making it hard for me to stay with him at that pace. I directed Mr. Whitlock to stay with me as his escort but he would not comply. In order for me to stay with Mr. Whitlock I had to run. He managed to get to the other side of the courtyard and then I saw him exit the main courtyard. I followed him back to the treatment unit." (Moncada Decl. ¶ 17.) Moncada "momentarily lost site (sic) of Mr. Whitlock as he moved through a group of patients." (*Id.* ¶ 24.) Moncada did not see Whitlock actually strike anyone in the main courtyard, but she did see a patient (presumably Plaintiff) on the ground just before Whitlock exited the courtyard. (*Id.* ¶ 18.)

On this record, Plaintiff cannot create a genuine issue of material fact as to the existence of a substantial risk of serious harm from Moncada escorting Whitlock to the main courtyard on "line of sight" observation. Plaintiff argues that Whitlock had a "long history of violent attacks on other patients." (Complaint at 5; Plaintiff's Reply to Defendant's Answer ¶ 11; *see* Albertson Decl., attached as Exh. A to Complaint.) No one disputes that Whitlock suffers from a severe mental illness that causes aggressive behavior toward others. (Maguire Decl. ¶

11

2.) However, the institution "may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety for all residents." *Youngberg*, 457 U.S. at 324. There is no evidence that Whitlock had exhibited "precursor behaviors" close in time to February 10, 2006. (Maguire Decl. ¶¶ 2, 9, 11; Exh. B at 1 to Moncada Decl.) There is no evidence that Whitlock knew Plaintiff or had difficulty with Plaintiff before. (Maguire Decl. ¶¶ 12-13.) In explaining why he punched Plaintiff, Whitlock said he was scared because he saw Plaintiff (who was walking around the track) coming toward him. (Nunez Decl. ¶ 5 & Exh. at 55, 58 attached thereto; Moncada Decl. ¶¶ 20, 22.) While it is unfortunate that Whitlock got away from Moncada, there was no substantial risk of serious harm on this record and there is no evidence that Moncada did not act reasonably even if she did not prevent the assault. *See Farmer*, 511 U.S. at 844.

## 2. Qualified Immunity

Even assuming that Plaintiff could establish a genuine issue as to a substantial risk of serious harm, Moncada is entitled to qualified immunity because the constitutional right was not clearly established. The question of whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad proposition." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. "Officers can have reasonable, but mistaken, beliefs about the facts" or about what the law requires in a given situation. *Id.* at 206.

As discussed above, the Supreme Court has not defined "at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes." *Farmer*, 511 U.S. at 834 n.3; *Ford*, 301 F.3d at 1051.

///

Under the specific facts of this case, it would not be clear to a reasonable staff employee when the risk of harm "changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm." *Ford*, 301 F.3d at 1051 (emphases in original).

The Ninth Circuit's decision in *Ford* under the Eighth Amendment gives "helpful guidance as to the standards to be applied" because the facts in *Ford* are more extreme than those presented in this case. See *Hydrick*, 500 F.3d at 998. Ford's estate brought suit under § 1983 after Ford, an inmate at the California Medical Facility-Vacaville, was killed by his cellmate, Diesso. *Ford*, 301 F.3d at 1045. Diesso had an extensive history of violent altercations with guards and other inmates, including one cellmate earlier in the same month Diesso killed Ford. On the other hand, Diesso had been double-celled with Ford and other inmates before without problems, had been put back on medication after the incident with the cellmate in the same month, and had been double-celled with Ford for three days without incident. *Id.* at 1046, 1048, 1051. The Ninth Circuit found that "a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high." *Id.* at 1050. Although the defendants' decisions "turned out to be quite unfortunate judgments, we cannot say that a reasonable correctional officer would have clearly understood that the risk of serious harm was so high that he should not have authorized the double-celling." *Id.* at 1051.

Here, Moncada was aware of a possible risk of harm, but "reasonably believed that escorting Mr. Whitlock to the main courtyard was safe and that Mr. Whitlock would follow my directions." (Moncada Decl. ¶ 23.) As discussed above, the evidence in the record indicates Whitlock was behaving appropriately during a walk in the main courtyard earlier in the day on February 10, 2006, and for at least two days prior to the incident. There was no evidence of "precursor

13

behaviors." On this record, it was not clear to a reasonable staff employee that escorting Whitlock to the main courtyard on "line of sight" observation "posed such a substantial risk of serious harm that doing so would be constitutionally impermissible." *Ford*, 301 F.3d at 1053 (footnote omitted).

## V.

## RECOMMENDATION

For the reasons discussed above, it is recommended that the District Court issue an Order (1) adopting this Report and Recommendation and (2) directing that Defendant's motion for summary judgment be granted.

DATED: June 10, 2008

_____
ALICIA G. ROSENBERG
United States Magistrate Judge

14

## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but are subject to the right of any party to file Objections as provided in the Local Rules Governing Duties of Magistrate Judges, and review by the District Judge whose initials appear in the docket number. No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.